# United States Court of Appeals
## For the First Circuit

No. 10-2193

MARK FRAPPIER,

Plaintiff, Appellant,

v.

COUNTRYWIDE HOME LOANS, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor,  U.S. District Judge]

Before

Boudin, Lipez and Howard,

Circuit Judges.

Valeriano Diviacchi with whom Diviacchi Law Office was on brief for appellant.
Brook L. Ames with whom James W. McGarry, Mark T. Knights and Goodwin Procter LLP were on brief for appellee.

July 7, 2011

**BOUDIN, Circuit Judge**.  In this diversity case, plaintiff Mark Frappier sued defendant Countrywide Home Loans, Inc. ("Countrywide"), alleging that Countrywide engaged in prohibited predatory lending practices with respect to his home mortgage loan for a property at 26 Matthews Road in Southwick, Massachusetts (the "home").  The district court granted Countrywide's motion for summary judgment, and Frappier appeals.

Frappier and his second wife purchased the home in 1999 with an $88,272 mortgage loan.  Over the next six years, he refinanced the loan four times, each time pulling more equity out of the property.  The further refinancing at issue in this case was precipitated by Frappier's March 2006 divorce from his third wife, pursuant to which Frappier was required either to sell the home by a set deadline or to refinance the then existing $193,000 mortgage loan to remove his ex-wife's name from the loan.

At first, Frappier tried to sell the home, applying (with his new girlfriend) for a mortgage loan from Countrywide on another Southwick property (the "South Longyard Road property"), contingent upon the sale of the home.  Countrywide loan originator Richard Mamuszka, who was paid by Countrywide strictly on commission, was the employee who worked with Frappier and his girlfriend on their loan application in this transaction and with Frappier in his subsequent transactions.  Sometimes the couple met with Mamuszka but usually the dealings were by telephone.

In this and in the later applications, Frappier provided information and Mamuszka filled in the application form, this first one being completed in August 2006. Frappier says that the couple were seeking a full-document loan, requiring verification of income and assets, and that he submitted such documents. Countrywide asserts that the application was for a stated income, stated asset ("SISA") mortgage loan, which involves little verification but is based largely on the borrowers' credit score and asserted income.

Frappier's completed South Longyard Road property application stated, inaccurately, that his employment position was operations manager at a parish church, that his monthly base employment income was $5,563, that he received $2,656.25 in monthly social security income, and that his total monthly income was therefore $8,219.25. In fact, Frappier was earning about $1,200 per month as a part-time janitor at the church, and received $2,100 per month in disability retirement income, for a total income of $3,300 per month.

Frappier states in an affidavit, not inconsistent with his less precise deposition testimony, that he submitted the correct income documentation to Mamuszka, including tax returns showing an employment income of about $1,200 per month in 2005 and 2006, and that he never told Mamuszka to list his occupation as

operations manager or to inflate his income.[1]  Mamuszka testified in his deposition that he never inflated a borrower's occupation title or income so that the borrower could qualify for a loan.  The South Longyard Road property loan was approved but never effectuated because Frappier was unable to sell his home in the time required by his divorce agreement.

Because Frappier was unable to sell the home, he was obligated to refinance his existing mortgage, and in September 2006 he asked Mamuszka about obtaining a refinancing.  On September 19, Mamuszka took by telephone Frappier's application for what the parties agree was a SISA mortgage loan.  Frappier's income and job were the same as before.  The application listed Frappier's occupation as operations manager and his base employment income as $5,563 per month; unlike the prior application, it did not list any social security income.  Again, the parties now dispute who was to blame for the false statements.

The closing date--the date on which Frappier signed the mortgage application and the mortgage loan closed--was October 27, 2006.  Although Frappier's testimony is not clear on this point, his subsequent sworn affidavit asserts that he never received a copy of his loan application or any other documents before October

---

[1]Elsewhere, Frappier states that Mamuszka did tell him that Mamuszka would need to change his occupation title to make it sound better and "would take care of it," but Frappier says that he did not understand that to mean that Mamuszka would enter a fraudulent occupation title or income.

27. Frappier also testified that at the closing he blindly signed but did not read the loan application or other papers that Countrywide's attorney told him to sign because earlier "Mr. Mamuszka said he'd take care of it. He said to sign this; I'll take care of it, and you'll be all set." The documents state, of course, that the signer has read them and that the information set forth is correct.[2]

Countrywide then provided Frappier with a loan in the amount of $189,500, secured by a mortgage on the home, with a fixed interest rate of 6.875 percent for the first seven years and an adjustable rate of up to 11.875 percent for the remainder of the loan. The loan made Frappier's payments total between $1,500 and $1,600 per month--similar to the monthly payments on the home that Frappier and his third wife were making before their divorce.

On November 17, 2006--three weeks after the first home mortgage loan closed--Mamuszka took by telephone a second home mortgage application for Frappier, this time in the amount of $38,500 as an equity loan for the home, Frappier aiming to pay off credit card debt and various obligations incident to the divorce.

---

[2]Mamuszka testified that he had a standard practice of sending the mortgage application documents to the customer after he filled out the forms and well before closing; that he had a standing practice of telling the customer to review all documents to make sure that everything was correct before signing them; and that he did not think that he appeared at any customer's closing, including Frappier's.

The second mortgage was a fixed-rate mortgage at 10.375 percent, which would require additional monthly payments of about $330.

This application once again listed Frappier's occupation as operations manager but now listed his total monthly income as $8,883.31--the sum of (1) the false $5,563 base employment income figure used in both of Frappier's earlier mortgage applications and (2) $3,320.31 in monthly social security disability income. Frappier again says he never provided the false information and did not read the papers before signing them; Countrywide asserts that Mamuszka obtained everything from Frappier himself. The second home mortgage loan closed on December 13, 2006.

In or around February 2008, Frappier began to have trouble making payments on both mortgage loans, and he defaulted on the loans later in the year. Countrywide foreclosed on the home and in February 2009, sent Frappier a form listing the balance of principal outstanding for his mortgage as $187,013.78 and the fair market value of the property as $359,604.28.

In May 2009, Frappier filed suit against Countrywide in Massachusetts state court, alleging a violation of Mass. Gen. Laws ch. 93A ("Chapter 93A"), unjust enrichment, a violation of the implied covenant of good faith and fair dealing, negligence, and entitlement to equitable relief, namely, rescission of the loan note and an injunction ordering the removal of the loan from his credit history. The complaint's theory was that Countrywide

fraudulently inflated his occupation title and income so that it could qualify him for a mortgage loan for which he would not have otherwise qualified and which Countrywide knew he could not repay. If not for the mortgage loan, Frappier alleged, he could have sold the property, paid off his prior mortgage, had more than $50,000 left over from the equity, not suffered a loan default, and not lost the value of the payments he made to Countrywide through 2008.

Countrywide removed the case to federal court and moved for summary judgment, which Frappier opposed, cross moving himself. Thereafter, the district court granted Countrywide's motion, finding that Frappier had produced no evidence that Countrywide knew, believed, or intended that Frappier would default. The court noted that the mortgage required monthly payments similar to the prior mortgage on the house and that Frappier himself attributed the default to several unforeseeable factors, such as a change in job and increased heating costs. Frappier then appealed.

We review the district court's decision de novo, Tayag v. Lahey Clinic Hosp., 632 F.3d 788, 791 (1st Cir. 2011), for any error of law and to determine whether any genuine issue of material fact barred summary judgment, Hunt v. Golden Rule Ins. Co., 638 F.3d 83, 86 (1st Cir. 2011). Ordinarily, sworn testimony by the opposing party may preclude summary judgment, Velazquez-Garcia v. Horizon Lines of P.R., Inc., 473 F.3d 11, 18 (1st Cir. 2007), although evidence from the moving party may resolve factual issues

where no contrary evidence was tendered, Statchen v. Palmer, 623 F.3d 15, 18 (1st Cir. 2010).

Countrywide argues that Frappier himself conceded that he had supplied Mamuszka with the critical false statement that his base monthly income was $5,563. It points to its own assertion to this effect at the end of paragraph 13 of its statement of undisputed material facts that Frappier's own counter-statement failed to deny. But this was patently an oversight: Frappier's own statement elsewhere asserted that at no time did he "instruct or request" Mamuszka "to inflate his income" above its true $3,300 monthly figure, and he had denied in his deposition and affidavit that he gave Mamuszka any false information about his income or title.

Countrywide cites to us two precedents on failure to deny a statement of undisputed facts. Both, however, are readily distinguishable;[3] and based on a practical rather than a technical approach to the problem, City of Waltham v. U.S. Postal Serv., 11 F.3d 235, 243 (1st Cir. 1993) (Breyer, C.J.); see also Swallow v. Fetzer Vineyard, 46 F. App'x 636, 638-39 (1st Cir. 2002), Frappier did contradict Mamuszka's version. Indeed, the district court's

---

[3]In Stonkus v. City of Brockton School Dep't, 322 F.3d 97, 100, 102 (1st Cir. 2003), the plaintiff filed no opposition to the defendant's motion for summary judgment or statement of undisputed material facts; in Zimmerman v. Puccio, 613 F.3d 60, 63 (1st Cir. 2010), the district court deemed the plaintiffs' statement of facts admitted in the absence of proper opposition by the defendants.

own local rule says statements of undisputed facts will be deemed admitted "unless controverted by the statement required to be served by opposing parties." D. Mass. Local R. 56.1 (emphasis added).

Thus, whether Frappier deceived Mamuszka or Mamuszka deliberately falsified the loan application is a question of fact suitable for trial. If the latter, Mamuszka would have defrauded his own employer, not Frappier. The problem for Countrywide is that Massachusetts' Supreme Judicial Court ("SJC") has read chapter 93A to hold that making a loan that the lender knows cannot be paid back may be an "unfair or deceptive act[] or practice[]," Mass. Gen. Laws ch. 93A, § 2(a), giving the borrower a cause of action. Commonwealth v. Fremont Inv. & Loan, 897 N.E.2d 548 (Mass. 2008).

The holding of Fremont was that Chapter 93A prohibits "the origination of a home mortgage loan that the lender should recognize at the outset the borrower is not likely to be able to repay." 897 N.E.2d at 560. The district court acknowledged Fremont but found that Frappier had not produced evidence that Countrywide knew, should have known, or intended to set him up for default through the October 2006 home mortgage loan. The reasons given, however, do not seem to us to justify summary judgment.

First, the district court reasoned that Countrywide should not have anticipated Frappier's default because the terms of the October 2006 mortgage were comparable to the terms of

Frappier's previous mortgage in that they required similar $1,500 to $1,600 monthly payments, at least while the introductory rate was still in effect (as it was when Frappier defaulted). But Frappier argues that although the introductory rate monthly payments were similar, his circumstances were visibly different.

The 2005 mortgage issued by the previous lender had two borrowers--Frappier and his third wife--and Frappier says that both were income earners contributing to the monthly payments; in contrast, Frappier was the only borrower for the October 2006 Countrywide loan. Countrywide argues that Frappier produced no evidence that his third wife contributed to the monthly payments, but it is undisputed that she was a co-borrower listed on the mortgage, and anyway, in most two-income households, income of each spouse lessens the joint burden.

Second, the district court reasoned that Countrywide should not have anticipated Frappier's default because, in his deposition testimony, Frappier attributed the default to several factors, including the fact that he changed jobs, the high cost of heating oil, and other incidental expenses. But this hardly means that Countrywide should not have recognized at the outset that Frappier was likely to default.

Frappier's argument is that the mortgage was doomed to foreclosure from the start because it required him to pay about three-quarters of his income to cover debts, including about half

of his income to Countrywide alone; and although he was able to manage payments for about eighteenth months, even then the balance of principal outstanding was still over $187,000, and it was unreasonable from the outset to anticipate that he could repay the loan.

Countrywide makes additional arguments not relied upon by the district court as to why it should not have anticipated Frappier's default. One is that Frappier told Mamuszka that his monthly income was $5,563, and, indeed, the loan applications stated that his monthly base income was $5,563. But whether Frappier so represented to Mamuszka is a disputed question of material fact; and Frappier also claims to have signed the applications without knowing that they contained false information inserted by Mamuszka--again something that Countrywide might dispute at trial.

In many circumstances a signatory may be bound by the contents of a document he signed even if he has not read it; but Massachusetts, along with other courts, is often more forgiving at least where deliberate fraud by the other side confronts mere negligence by the signer. E.g., King v. Motor Mart Garage Co., 146 N.E.2d 365, 367 (Mass. 1957).

Indeed, it appears Massachusetts may go even further. Thus, in Commonwealth v. H&R Block, Inc., 25 Mass. L. Rep. 92, 2008

Mass. Super. LEXIS 427, at *29 (Mass. Super. Nov. 25, 2008) (Gants, J.), the court held that under Chapter 93A, a SISA loan

> may be an unfair or deceptive act if the lender used this vehicle to issue loans based on loan applications that it knew or should have known were false, and thereby in some fashion encouraged or tolerated the borrower's false representations.

See also Silva v. OneWest Bank, FSB, 27 Mass. L. Rep. 61, 2010 Mass. Super. LEXIS 106, at *9 (Mass. Super. May 19, 2010); Fazio v. Bank of America, NA, 27 Mass. L. Rep. 81, 2010 Mass. Super. LEXIS 108, at *9 (Mass. Super. May 13, 2010).

Countrywide next argues that even if Frappier's monthly income was only $3,300, he still would have qualified for the loan and should have been able to repay it because payment would still be slightly less than half his income. But Countrywide's own practices certainly do not control whether the loan was foreseeably likely to go into default--Countrywide was protected either way by the value of the house--and Frappier has some evidence based on Countrywide's own documents that the true $3,300 income figure would have failed Countrywide's minimum debt-to-income ratio.[4]

Countrywide argues that the documents are inadmissible on summary judgment because they have not been authenticated. We need

---

[4]Frappier's monthly mortgage debt obligations on the October 2006 mortgage were close to half of his real income ($1,500 to $1,600 on his $3,300 income); and, if one included his other non-mortgage debts of which Frappier says Countrywide was aware, his total debt-to-income ratio would be 73.57 percent.

not decide this issue because Frappier, who admittedly has the burden of establishing the elements required by Fremont, has at least raised triable issues as to both what Countrywide knew and whether it would have made the loan knowing Frappier's true income. After all, if Mamuszka did raise Frappier's income level without the latter's knowledge, it was arguably because he thought it necessary to secure and justify the loan.

Besides his principal Chapter 93A claim, Frappier brought a claim for unjust enrichment to recover all paid interest on the October 2006 mortgage loan. To recover for unjust enrichment under Massachusetts law, Frappier must show that (1) Countrywide knowingly received a benefit (2) at his expense (3) under circumstances that would make retention of that benefit unjust. See Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 57 (1st Cir. 2009). Frappier's theory of injustice is more or less the same as his chapter 93A theory.

The district court dismissed the claim for the same reason as the chapter 93A claim: solely on the ground that there was no evidence in the record to conclude that Countrywide had any reason to believe that Frappier was at a heightened risk of default, so Frappier's payment of interest to Countrywide could not have been unjust. If there are other reasons to support the dismissal, Countrywide has not identified them, so this claim too must be remanded.

Frappier's third claim was based on yet another theory--the covenant of good faith and fair dealing, FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d 93, 100 (1st Cir. 2009)--and in part on a second transaction. Countrywide, Frappier contends, did not care whether he was able to repay the October 2006 loan and, in granting him the December 2006 loan, Countrywide reduced the equity that he had in the home, increased the sum of his monthly mortgage payments, and thus increased his risk of default on the October 2006 loan.

It may be debatable whether the state court glosses on the covenant concept make it a third vehicle for Frappier's "likely to default" theory that underpins the first two claims. See generally FAMM Steel, 571 F.3d at 100; Shawmut Bank, N.A. v. Wayman, 606 N.E.2d 925, 928 (Mass. App. Ct. 1993). In any event, the district court dismissed the claim on the same ground as the other two and we must remand it too so far as the claim is directed to the October 2006 loan.

Countrywide argues in the alternative that the attack on the December loan is an independent claim for a different transaction essentially forfeited because Frappier did not mention the December second home mortgage or any facts pertaining to it in his complaint. This is correct and a new transaction cannot be asserted for the first time at summary judgment. However, the

-14-

district court might on remand allow an amendment to the complaint. <u>Kunelius</u> v. <u>Town of Stow</u>, 588 F.3d 1, 19 (1st Cir. 2009).

Frappier's fourth claim was based on negligence. Under Massachusetts law, Frappier would have to show (1) a legal duty of care owed by Countrywide to him, (2) a breach of that duty, (3) proximate or legal cause, and (4) actual damage or injury. <u>Primus</u> v. <u>Galgano</u>, 329 F.3d 236, 241 (1st Cir. 2003). In wielding this theory, Frappier is not clear as to what action he is attacking; but the most coherent version is that Countrywide should be liable if it were merely careless in extending a loan he was unlikely to repay. However, "under Massachusetts law, the relationship between a lender and a borrower, without more, does not establish a fiduciary relationship."[5]

Frappier argues that he worked with Mamuszka for months, had his personal telephone number, and trusted him because Mamuszka repeatedly offered to "take care" of his mortgage. Massachusetts case law does allow some room for unusual facts in which one side invites, and the other side reposes, a special trust and reliance. <u>FAMM Steel</u>, 571 F.3d at 102 (citing <u>Broomfield</u> v. <u>Kosow</u>, 212 N.E.2d 556, 560 (Mass. 1965)). But Frappier cites no case involving facts

---

[5]<u>FAMM Steel</u>, 571 F.3d at 102 (citing <u>Superior Glass Co.</u> v. <u>First Bristol Cnty. Nat'l Bank</u>, 406 N.E.2d 672, 674 (Mass. 1980)). <u>See also</u> <u>Clark</u> v. <u>Rowe</u>, 701 N.E.2d 624, 629 (Mass. 1998); <u>Urman</u> v. <u>South Bos. Sav. Bank</u>, 674 N.E.2d 1078, 1081 (Mass. 1997); <u>Nat'l Shawmut Bank of Bos.</u> v. <u>Hallett</u>, 78 N.E.2d 624, 628 (Mass. 1948); cf. <u>FDIC</u> v. <u>Fordham</u> (<u>In re Fordham</u>), 130 B.R. 632, 648 (Bankr. D. Mass. 1991).

as mundane as his own, and the examples we have found are far more extreme. E.g., Patsos v. First Albany Corp., 741 N.E.2d 841 (Mass. 2001); Warsofsky v. Sherman, 93 N.E.2d 612, 614-16 (Mass. 1950).

Frappier's more developed argument is that Fremont should be read or extended to support a common law negligence claim against a bank that carelessly overextends credit. But the Superior Court author of the Fremont doctrine, now on the SJC himself, went out of his way to say that "an act may violate Chapter 93A without constituting a cause of action under any common law tort," Commonwealth v. Fremont Inv. & Loan, 23 Mass. L. Rep. 567, 2008 Mass. Super. LEXIS 46, at *24 (Mass. Super. Feb. 25, 2008) (Gants, J.). Chapter 93A usually requires a level of fault going beyond mere negligence,[6] and if common law negligence is to be expanded in Massachusetts, it should be done by the state courts.

Finally, Frappier sued for rescission/equitable relief and asked for an injunction ordering the removal of the October 2006 home mortgage loan from his credit history. The district court found that the count did not articulate a cause of action and that there were no facts in the case that would justify the

---

[6]See Baena v. KPMG LLP, 453 F.3d 1, 3 (1st Cir. 2006); Damon v. Sun Co., Inc., 87 F.3d 1467, 1484 n.10 (1st Cir. 1996); see also Darviris v. Petros, 812 N.E.2d 1188, 1192-93 (Mass. 2004); Meyer v. Wagner, 709 N.E.2d 784, 793 (Mass. 1999); Walsh v. Chestnut Hill Bank & Trust Co., 607 N.E.2d 737, 740 (Mass. 1993).

requested injunctive relief.  On appeal, Frappier has not offered a contrary argument.

Accordingly, we <u>affirm</u> the district court's decision insofar as it dismissed (1) the covenant claim relating to the December loan, (2) the negligence claim in its entirety, and (3) the rescission/equitable relief claim, but we <u>vacate</u> the dismissal of the other claims and also the covenant claim so far as it may relate only to the October 2006 loan, and we <u>remand</u> the case for proceedings consistent with this opinion.  Costs are awarded to the appellant.

<u>It is so ordered</u>.